GEORGIA RY. &c. CO. *et al. v.* CITY OF ATLANTA *et al.*

This case (on writ of error from a denial of prayers for injunctive and mandatory relief) being for decision by a full bench of Justices and Judges, who are evenly divided in opinion, Beck, P. J., and Hodges and Tarver, JJ., favoring an affirmance of the judgment, and Gilbert, Jones, and Hammond, JJ., favoring a reversal, the judgment of the court below stands affirmed by operation of law.

Nos. 3228, 3229. DECEMBER 27, 1922.

Equitable petition. Before Judge Pendleton. Fulton superior court. April 10, 1922.

Chief Justice Fish and Associate Justices Atkinson, Hill, and Hines being disqualified, Judges Hammond of the Augusta Circuit, Hodges of the Northern Circuit, Jones of the Northeastern Circuit, and Tarver of the Cherokee Circuit were designated to sit instead.

*Colquitt & Conyers,* for plaintiffs.

*James L. Mayson* and *Jesse M. Wood,* for defendants.

HODGES, Judge. The Georgia Railway & Power Co. and the Georgia Railway & Electric Co. brought an equitable petition against the City of Atlanta, the Mayor and General Council of said city, and H. L. Collier, as chief of construction of said city, to prevent the defendants from interfering with and preventing them from making certain installations in the streets of the City of Atlanta, which they contended were necessary to enable them to exercise their rights under their franchises, in furnishing com-

mercial power, light and heat by electricity. The plaintiffs will hereafter be designated as "the companies," and the defendants will be designated as "the city." The suit was founded upon claimed charter powers from the State and franchise grants and rights from the City of Atlanta.

The material allegations of the companies' petition are the following: That by virtue of their charter rights and franchises they had the right to make certain installations fully described in their petition, upon complying with all reasonable police powers, and regulations of the city. That the companies and their predecessors entitled under their franchises from the city had the right to make use of the streets under police regulations, and to place under the surface thereof, and maintain and use all necessary conduits, wires, manholes, service-boxes, etc., for the purpose of conducting, supplying, and distributing electricity for heat, lights, and power to the public, and for the purpose of extending, operating, repairing, and renewing the same. That on December 9, 1921, by the reason of the growth of said city, and of their public business, and particularly within the inner fire limits, or underground district, it became necessary for them to lay additional conduits, cables, manholes, and appliances; and on January 13, 1922, they made application to the city for permission to open Ivy Street, Auburn Avenue and James Street for the purpose of constructing these duct lines and five manholes. On January 18, 1922, the city issued to the companies two permits authorizing the construction of the duct lines and manholes in said streets, upon conditions previously fixed by the General Council of the city. The condition fixed to these permits (which is the storm center of the instant litigation) reads as follows:

"The city reserves the right at any time, after six months notice to said applicant company (said applicant company being the applicant above named) to rescind and repeal the grants herein made and without liability to the city on account thereof; provided that the same agrees not to rescind or repeal permits except to accommodate public or municipal purposes, and not for the purposes of accommodating private individuals or private purposes."

On January 19, 1922, the companies declined to accept the permits with said condition fixed thereto.

The companies' petition further alleges, that the extension of

the distributing system made necessary to enable them to perform their public service demands the construction and location of the additional manholes and ducts hereinbefore referred to, and petitioners cannot supply, as required by law, to the public who have made application therefor the electricity which petitioners are bound to supply, without laying and constructing said conduits and manholes in said streets as applied for in said permits. That said companies have the plain contract right, under the contract hereinbefore set out, to open said ducts and manholes, and to install therein the necessary appliances, and they propose to use and applied for the right to use no more of the ground under the surface of said streets than was necessary for the proper conduct and extension of their growing public business, which they are obligated under their public duties to conduct and to perform. That the refusal to grant permits to open said streets and to do said work was a plain violation of the contract rights of petitioners. The attempt to attach to said permit a right of the City of Atlanta, at its will, to revoke said permit and to require the removal of said appliances, was an attempt to convert the franchise and contract rights of petitioners into a naked, revocable license, practically valueless to petitioners, and subjecting petitioners to immense pecuniary loss, and to other irreparable injuries, by reason of the removal of said appliances at a great cost and the interruption and disarrangement and damages of the public business of petitioners. That said City of Atlanta cannot in equity and good conscience refuse to allow to petitioners their plain contract rights under said contract, and at the same time retain and continue to collect from petitioners the consideration of said contract rights in the amount of hundreds of thousands of dollars per year. That said companies recognize the right of the city of Atlanta to supervise the work in the streets of said city, necessary to be done in the installation of the appliances for the extension of the public business of petitioners. Said companies aver that the condition annexed to the permit hereinbefore referred to, to the effect that the city can revoke said permit on notice and require the removal from under the streets, is not an exercise of the police power, but is in plain derogation of the contract rights of petitioners. That the action of the chief of construction in refusing to allow said companies to open said streets, and in arresting large numbers of

workmen employed by petitioners to do said work, and in threatening to continue said arrests and prevent petitioners from opening said streets, except upon said illegal condition, and the ordinances of said city attempting to fix said illegal condition upon the exercise of the contract rights of said companies, are in violation of the constitution of the State as contained in the Civil Code, § 6358, in that they deny to petitioners their constitutional right to have impartial and complete protection of their property; also in violation of said constitution as contained in section 6359, in that they deprive petitioners of their property without due process of law; also in violation of said constitution as contained in section 6388, in that such enforcement is taking of property of petitioners without just compensation; also in violation of said constitution as contained in section 6389, in that it is an impairment of the obligations of the contract of petitioners, as made with the State of Georgia and with the City of Atlanta; also in violation of said constitution as contained in section 6390, in that it is an attempt to revoke the privileges of petitioners in such manner as to work injustice to the stockholders and creditors of petitioners; also in violation of the constitution of the United States, as contained in article 1, section 10 (Civil Code, § 6652), in that it impairs the obligation of the contract of petitioners; also in violation of said constitution and of the 14th amendment thereof, as contained in section 6700, in that it deprives petitioners of their property without due process of law, and denies to petitioners the equal protection of the law.

The prayers of said petition are, that defendants be enjoined from denying to the companies their contract rights to install their appliances in said streets; from interfering with them in the exercise of said rights, etc.; from affixing or attempting to affix upon said permits said illegal conditions, especially said condition of revocability at will; and that defendants be required to allow said companies the free exercise of their contract rights in doing said work, subject to reasonable police regulations, and to issue to petitioners such permits as may be necessary to accomplish said purpose; and that defendants be enjoined from completing the pavement on Auburn Avenue until petitioners' structures are built below said street.

The following is substantially the answer of the defendant city:

The companies, as a necessary incident to conduct their business have the power, subject to the police regulations of the State, to use the public roads and streets of said State for the installation of the necessary poles and wires, but defendant denies the power to install "transformers and other equipment required." The companies are public-service corporations charged with the duty of furnishing commercial power, light, and heat by electricity, empowered under the laws of the State to exercise all the power and to use all the means necessary to the performance thereof, including the use of the public roads and streets of the State, except the unrestricted right to use the public roads and streets in the city. The companies hold various grants and franchises from the city, which authorize them to open the streets within the fire limits, and to lay conduits, wires, manholes, and all necessary appliances and connections for the business and purpose of conveying, using, conducting, and distributing electricity for light, heat, and power for public and private use, subject to the following conditions: "Material and actual locating and execution of the work to be under the supervision of the Board of Electrical Control and city engineers, subject to reasonable ordinances. The conditions are as named in the companies' petition, relative to their contract with the city in their charter, except the one containing the terms of the grant. As the growth in business and population of said city develop and increase, the volume of the business of said companies necessarily increases herewith; and said companies have been compelled from time to time to extend and increase their facilities for the performance of their public service to the public at large, as they are, by law and by orders of the Railroad Commission, compelled to do. The city does not deny the companies the privilege to construct conduits, lay ducts, and build manholes, but does deny the right of the companies to use the streets of the city for the purpose of building transformer stations therein. Until very recently said companies have not sought to build transformer stations in the streets. When this was called to the attention of the city, it denied the right to build these stations, unless there was coupled with this permission the right on the part of the city to withdraw same on six months notice. The companies have heretofore been able to operate without calling upon the city for such an extended use of the street.

They have now done so; and the city takes issue with such claim of right. The city does not now refuse to allow said companies to open streets for the purpose of constructing conduits and ducts, wires, etc., therein, nor for the purpose of constructing manholes therein; but it does deny the right of said companies to use the streets for the purpose of constructing transformer stations therein, upon the ground that such stations or vaults would practically usurp one side of the street, and either prevent or render very doubtful any further use of that side of the street for such municipal purposes as sewers and water-pipes, or from any other proper and public use thereof. The large amount of money that the companies allege they have paid into the city treasury for such privileges as aforesaid has been made out of and in connection with the uses granted, and the same were worth more than the amount paid; but the city denies that it has granted the right to said companies to construct large vaults in the streets to be used as transformer stations, by which other public uses would either be prohibited thereat or rendered extremely difficult. What the companies describe as a " manhole " is not a manhole as this term is ordinarily used, but is for the construction of transformer stations or vaults in the street, and the companies have no right to demand or receive a permit to use the streets for such purposes. The city denies that the enlarged service of the companies cannot be carried on without constructing transformer stations in the streets of the city, but says that said transformer stations could be constructed on private property which they serve, or on private property obtained for that purpose. The refusal to grant permits to open said streets and to do said work was not a violation of the contract rights of said companies. The city is not interfering with said companies in constructing conduits and building manholes, but is objecting when transformers are built in the streets or present manholes are enlarged to meet the demands of a transformer station. The condition attached to said permit is an exercise of the police power of the city, and is not in derogation of the contract rights of said companies. The action of the city in the matter is not in violation of any section of the constitution of the State or of the United States.

The issues in the case, both of law and fact, were, by agreement of the parties, submitted to the court to pass upon the same both

as judge and jury, and to render a final decree thereon; the same being heard upon the petition and the answer as evidence and other evidence introduced. The decree rendered was as follows:

" (1) That the franchise granted by ordinance of 1899, authorizing the Georgia Electric Light Company to use the streets, avenues, alleys, and public places of the City of Atlanta as in said ordinance provided, and the franchise granted the Georgia Railway & Electric Co., by ordinance of 1902, to use the streets, avenues, alleys, and public places of the City of Atlanta as therein specified, and the franchise granted the Georgia Railway & Power Co., by ordinance of 1912, to use the streets, avenues, alleys, and public places of the City of Atlanta as therein provided, constitutes a perpetual franchise, and the contracts executed by the acceptance of the same are now of force and effect and existing and operating.

" (2) That the raise of rates for the furnishing of electricity for light, heat, and power, ordered by the Railroad Commission of Georgia, upon the application of the Georgia Railway & Power Co., did not afford the City of Atlanta any right of defense to the present case, by reason thereof.

" (3) That the City of Atlanta had the legal right to affix to said permits the condition which is attached in the petition, to wit: 'The city reserves the right at any time, after six months notice to said applicant company, to rescind and repeal the grants herein made, and without liability to the city on account thereof; provided that the city agrees not to rescind or repeal permit except to accommodate public or municipal purposes, and not for the purpose of accommodating private individuals or private purposes,' the counsel for the city having stated in judicio, and said statement being made a part of this finding, that the words ' public purposes,' above set out, mean the same thing as the words 'municipal purposes.'

" (4) The City of Atlanta had the right and power to affix the said condition to said permits as against all the contentions of the plaintiffs as set out in their petition.

" (5) And it is further ordered, adjudged, and decreed that all the prayers of the plaintiffs as contained in the petition, both for injunction and for the issuance of said permits, be and the same are hereby denied; and final judgment is hereby rendered in

said case in favor of the defendants and against plaintiffs for costs, etc."

The evidence introduced, other than the petition and answer, while somewhat voluminous, is not in conflict, except in a few instances pertaining to the necessity of the installation of the manholes in question, and the reasonableness of the size of the same.

F. B. Davenport, a witness for the companies, testified, in part, as follows: He is an electrical engineer; he graduated from the Georgia School of Technology in 1904, with the degree of B. S. in Electrical Engineering. He is familiar with the underground electrical distribution system of the Georgia Railway & Power Co. in the City of Atlanta; he prepared the application for the permit for the underground conduits, manholes, etc., which are involved in this suit. He is acquainted with the proposed conduits, manholes, etc., and their uses, and of the necessity for the construction and maintenance of said conduits, manholes, and other structures for the purpose of conducting, supplying, and distributing electricity for use in the City of Atlanta. These manholes are necessary at all street intersections, for the purpose of feeding into the cross-streets; they are likewise necessary for the purpose of taking off service connections to customers along the way or in the immediate neighborhood. The depth of the manhole structure is approximately eight feet. These manhole structures consist of brick masonry walls, the top thereof being covered with reinforced concrete, reinforced with railroad rails, the top of the structure being approximately one foot below the surface of the street, the opening into the surface of the street being circular in form, having a diameter of thirty-five inches, and covered with a cast-iron manhole top or cover; the structure is designed to and will support the street traffic, and when completed it does not interfere with or impede or diminish in any way the full use of the surface of the street. This conduit line and these manholes are needed at the present time, to meet the increased demands for electrical service in the City of Atlanta, and particularly in the inner fire limits of the city. The conduits, manholes, and structures are no larger than are reasonably required for the business and purpose of conveying and distributing electricity for light, heat, or power within the close or inner district of the fire limits of the city. Un-

less the transformers are installed within the manholes in the street, it would be impractical, under the conditions in Atlanta, to supply and distribute electricity for lights, heat, or power for public or private use in underground conduits within the close or inner districts of the fire limits of the city. The manholes in question are all of such size as are absolutely necessary for the distribution of electricity, and are no larger than is necessary. They were designed of the sizes stated for the necessary purpose of distributing electricity, and with a view to under-surface portions of the streets in question. Should these structures be installed and subsequently the right to maintain them be rescinded or repealed, the petitioners would not only lose the investment made in installing these particular structures, but the customers in the immediate neighborhood of these structures would be unable to receive electric service, and likewise the entire system of distribution of electricity in the underground or inner fire limits would be impeded and interfered with and disarranged, and probably totally interrupted. The structures in question do not so occupy any portion beneath the surface of the street as to prevent the placing of any similar or other structures in the street for water, or for sewer, or for gas, or for telephone, or for other electric light or power purposes.

The plaintiffs introduced in evidence a franchise granted by the City of Atlanta in 1899 to the Georgia Electric Light Co., its successors and assigns, as follows:

" Sec. 1. That the Mayor and General Council of the City of Atlanta do ordain that the right and privilege is hereby granted to the Georgia Electric Light Co., its successors and its assigns, to open the streets, avenues, alleys, and public places (or such of them as it may from time to time deem necessary or proper) within the close or inner district of the fire limits of the City of Atlanta, as said district is now defined by the ordinances of the City of Atlanta, and to lay, maintain, and use therein tubes, conduits, ducts, wires, conductors, cables, insulators, manholes, and all necessary appliances and connections for the business and purpose of conveying, using, conducting, supplying, and distributing electricity for light, heat, or power for public or private use for the unexpired period covered by its franchise heretofore granted.

" Sec. 2. This right and franchise granted, however, only upon

the following conditions: . . Fifth condition: Said company, its successors and assigns, shall further submit and be subject to such reasonable regulation in the establishment and maintaining their system of underground conduits, etc., as the Mayor and General Council may hereafter, from time to time, ordain.

R. C. Turner, for the city, testified as follows: He is City Electrician of the City of Atlanta; it is within the scope of his duties to supervise all electrical construction within the corporate limits of the City of Atlanta. The Georgia Railway & Power Co. now has and is using, within the City of Atlanta, a number of transformer stations which are located on private property; among some of said stations are the Transporation Building on Marietta Street; another in Ponce de Leon Apartments. The plaintiffs have and also maintain transformer substations at several places in the city. In order to serve the general public with heat, light, and power generated by electrical current, it is not absolutely essential for transformer stations to be located under the surface of the street; but the same service could be rendered by locating the transformers on private property, by exercising due regard for the protection of life and property.

H. L. Collier, for the city, testified as follows: He is present Chief of Construction of the City of Atlanta, and at different times has been connected with the engineering and construction department of the city for many years. Heretofore, up to about three years ago, neither the Georgia Railway & Electric Co., nor the Ga. Railway & Power Co., nor their predecessors in this city used underground or subsurface vaults for transformers of the size and dimensions as now proposed by plaintiffs. Such vaults as they have heretofore used have been about six feet by eight feet in size, and only a limited number of them. Underground rooms or vaults of the size of 11 feet and 4 inches by 16 feet and 4 inches, and of the other sizes which plaintiffs propose to construct, and for which they have asked for permits, will interfere with the use which the city is required to make of the underground portion of the street, and from time to time extending its sewer-pipes and mains and its water-pipes and mains. Sewers are required to be run on a regular grade, sometimes about 12 or 15 feet underground, but more often at a smaller depth; these depths are oftentimes not more than from 2 to 6 feet underground. On Auburn

Avenue at Five Points, where these vaults are to be constructed, the depth of the sewer is about 8 feet; and on James Street at Ansley Hotel about 18 feet, and broken down. Many of our sewers are old and are frequently breaking. If a 10 by 15 feet vault were built over such a sewer as in James Street, we would have very serious results. Waterpipes in the city are laid at a uniform depth of from about 36 inches below the surface of the street. Said vaults would also interfere with the use of street by other utilities which require use of pipes, conduits, etc., in rendering service to the public. Deponent is of the opinion that it would be impracticable to run pipes and wires of the city or other utilities through these transformer vaults, for purpose of rendering service to the public.

Depositions of F. B. Davenport, introduced by the city, read as follows: I am one of the assistant engineers of the Electrical department of the Georgia Railway & Power Company. I am familiar with the construction and uses which these transformer vaults, to install which I have made application to the mayor and general council. I am familiar with the plans and specifications of these proposed structures. The proposed vault in Ivy Street is to be 16 feet, 4 inches, by 11 feet, 4 inches, exterior dimensions. The width of Ivy Street at this point I estimate to be 40 feet. The portion of the street these car lines occupy is about 14 feet. The size of the usual water-main in the down-town section of the city, some are 12-inch and some are 14-inch mains. It would be impractical to run such sewer-pipe through this structure. It is not true that we contemplate, in the construction and maintenance and use of this vault and similar vaults, that our company shall have the exclusive use of the interior of these structures. That is, of course, if there is a reasonable case where any other party want to go through that hole — finds it necessary to go through that hole with a reasonable size construction, it is perfectly feasible for them to do it. There are cases in town where this is done; there would be only certain kinds of service that could be rendered the utility companies by passing through this particular kind of vault; it would not admit of general use for that purpose. The company has transformer stations in the city, located at places other than those in the public streets of the City of Atlanta; located on private property; they have transformers in the streets too. There are 52

manholes in the City of Atlanta which have transformers in them. These holes would range from about 8 feet long by 6 feet wide up to the size which we ask for now.

Aside from the questions raised in the cross-bill of exceptions filed by the city, the latter concedes that the companies, by virtue of the charter rights granted them by the State and the franchise rights granted them by the city, have the privilege and right of entering upon the streets of the city for the purpose of constructing conduits, laying ducts and building manholes, but denies the right of the companies to use the streets of the city for the purpose of building transformer stations therein. On the other hand the companies contend that their right to install the manholes applied for unconditionally is legitimately within the purview of the charters and franchises granted them, and that the effort of the city to grant the permit in question on said condition is an impairment of their contract rights with the city. It seems, therefore, that the paramount and controlling questions are, what are the rights of the companies under their charters and franchises, and of the City of Atlanta under its delegated and implied powers as a municipality, so far as the same relate to the acts sought to be enjoined? Let us consider first the rights and duties in general of the city to control and regulate its streets.

" Without express legislative authority, a municipality cannot grant to any person the right to erect or maintain a structure or obstruction in a public street." Civil Code, § 894. " When opened the streets are usually subject to the control and regulation of the municipality, subject to the paramount authority of the State to resume its power at will. This municipal power, however, is liberally construed so as to effect the object of the grant and authorize the control of the entire length and breadth of the street; also above and below the surface as far as any proper street use may require, but not beyond the street line. A municipality ordinarily has the power to prohibit the obstruction of streets, and to fix the penalty for violation thereof; and ordinarily the determination of the common council that certain things are obstructions cannot be reviewed." 28 Cyc. 848, 849, 850. " The measure of municipal power to regulate the use of streets by quasi-public corporations chartered by the State to supply the public with water, light, conveyance, heat, information, and other conveniences, depends

largely upon the construction of charters and statutes by which the State confers such franchises on the companies, and delegates its own power of regulation thereof to the municipality. Three fundamental principles are recognized as the basis of settlement of the frequent contentions arising over such regulations, viz.: (1) The State has plenary power to regulate all quasi-public corporations, after as well as before their organization, in the exercise of their public functions; (2) This power may be delegated to municipalities either by charter or general law; and (3) The power to regulate does not authorize prohibition, although a license fee may be charged to compensate for regulation. Under these rules a municipality may enact and enforce all reasonable regulations for the protection of the public as to the manner in which the streets shall be used." 28 Cyc. 851.

In the case of *Simon* v. *Atlanta,* 67 *Ga.* 618 (44 Am. R. 739) it was held, "that streets and public places belong to the general as well as the local public; and that if the control and general supervision of streets is conferred by the legislature upon the municipality, such a corporation holds them in trust for the convenience and use of the public at large, and it becomes its duty not only to keep them in safe and suitable condition for the passage of persons and transportation of commodities, but the duty also devolves upon it of keeping them free from any such unauthorized obstructions as may permanently or unreasonably interfere with their public use and enjoyment. . . Usually this power is conferred in such general terms that it may be well said that municipalities in our State generally have the authority to open, care for, regulate, and improve their streets, and, when taken in connection with other powers, have all necessary authority to keep the streets free from obstructions, and to prevent the improper use of the same, and to pass such ordinances as will effectuate such an end. But with reference to streets in populous places the public convenience will require more than the mere right to pass over them.

In the case of *Macon Consolidated Street R. Co.* v. *City of Macon,* 112 *Ga.* 782 (38 S. E. 60), the question involved was whether or not the city had the right, by a resolution, to require said railroad to change the location of its track from the side to the center of a certain street, the track having been originally laid

under and by virtue of a contract between the railroad and the city. The following excerpt and authorities cited therein from the able opinion of Justice Cobb bear specially upon the questions involved in the case at bar: " ' A railroad company which secures the right to use the streets of a city takes such right subject to all reasonable regulations and ordinances enacted by the city in the exercise of its police power.' Elliott's Roads & Streets, § 807. . . ' The power of a municipal corporation to make police regulations includes authority to make reasonable provision for the peace, safety, and convenience of its inhabitants. Such regulations usually concern the use of streets, either by individuals or by corporations with railway cars.' 15 Am. & Eng. Enc. L. (1st ed.) 1167. These principles are well settled, but it is equally settled that having granted a railway company permission to lay its tracks in the streets, the municipal authorities cannot prevent the successful enjoyment of the franchise. In cases, therefore, of municipal regulation of the manner in which a street-railway company may enjoy the privilege granted to it to use the streets, the question often arises as to whether the regulation is a legitimate exercise of the police power of the city, or whether it really amounts to an unwarranted interference with the franchise. ' As applied to the control of street railways, the police power is the continuing and paramount authority of the legislature, within its constitutional prerogatives, and of municipal corporations, under their delegated powers, to establish regulations which promote the public welfare, do not unreasonably interfere with the franchise, management or business of the company, or violate the obligations of any valid contract.' Booth, St. Rwy. L., § 220, p.302. Every municipal regulation which does not amount to a deprivation or impairment of the franchise will be upheld, unless it is unreasonable and arbitrary. The discretion of the municipal authorities as to these matters is very broad, and it will not be interfered with save in the case just mentioned. Is a regulation by a city requiring a street-railway company to remove its tracks from one part of a street to another a legitimate exercise of its legislative power? We think it is, provided the proposed change is not arbitrarily and capriciously required by the city, but is really necessary for the convenience and welfare of the public. . . The municipal authorities must necessarily, in the exercise of their

discretion, be left to determine the necessity and propriety of the proposed change. The courts will not readily interfere with the governing authorities of a city in the performance of a discretionary act. It is only where it ' has passed the boundary of legislative and judicial discretion, and is exercising the municipal power arbitrarily to the injury and oppression of the citizen,' that judicial interference will be justified. *City of Atlanta* v. *Holliday, 96 Ga.* 546. . .

"Municipal corporations ' may make authorized contracts, but they have no power as a party to make contracts or pass by-laws which shall cede away, control, or embarrass their legislative or governmental powers, or which shall disable them from performing their public duties.' 1 Dillon, Mun. Cor. (4th ed.) § 97. ' A city cannot alienate its governmental and police powers.' Elliott's Rds. & Sts., § 805. ' It may be said, generally, that the State, or its duly authorized municipality, may require a street-railway company to do whatever is required for the health, safety, and welfare of the community; for the authority to enact measures for this purpose never passes from the sovereign, no matter what grants it may make.' Ibid. § 758. . . ' While municipalities, when authorized so to do, doubtless have the power to make certain contracts with respect to the use of their streets, which are obligatory upon them [citing authorities], the general rule to be extracted from the authorities is that the legislative power vested in municipal bodies is something which cannot be bartered away in such manner as to disable them from the performance of their public functions.' [Citing Wabash Railroad Co. *v.* Defiance, 167 U. S. 88 (17 Sup. Ct. 748, 42 L. ed. 87)]. The City of Macon having no power to make a contract whereby it surrendered its power to require the plaintiff in error to move its tracks from one part of the street to another, whenever such removal was necessary for the public welfare, such agreement made by the city cannot be used as the foundation for an estoppel to prevent the city from exercising its discretionary power to require such a change to be made."

"Municipalities are charged not only with the duty of regulating their streets, but also of controlling the same for the use and benefit of the public in general; and in the exercise of these governmental functions, there is necessarily a broad discretion vested in these municipalities, which will not be disturbed by the

courts unless it appears that this discretion has been abused or is fraudulently or grossly wrong or unjust." 28 Cyc. 882; *Dannenberg* v. *Macon,* 114 *Ga.* 174 (39 S. E. 880). " Grants of rights in streets are not to be extended by construction beyond the reasonable meaning of the language in which they are expressed. Where in derogation of the right of the public to free and unobstructed use of the streets, they will be construed strictly against the grantee and liberally in favor of the public." 28 Cyc. 882-3; Galveston Wharf Co. *v.* Gulf &c. Ry. Co., 81 Tex. 494 (17 S. W. 57) ; Willamette Iron Works *v.* Oregon Ry. Co., 26 Or. 224 (37 Pac. 1016, 46 Am. St. R. 620, 29 L. R. A. 88).

It will be observed that the original franchise granted by the city in 1899 to the Georgia Electric Light Co. (which company is properly termed the parent one), whereby this company obtained the right and franchise to open streets "within the close or inner district of the fire limits of the city, . . and to lay, maintain, and use therein tubes, conduits, ducts, wires, conductors, cables, insulators, manholes, and all necessary appliances and connections for the business and purpose of conveying, using, conducting, supplying, and distributing electricity for light, heat, or power for public or private use," was granted only upon certain conditions. The fifth condition in this grant being as follows: " Said company, its successors and assigns, shall further submit and be subject to such reasonable regulation in the establishment and maintaining their system of underground conduits, etc., as the Mayor and General Council may hereafter, from time to time, ordain. By regular deeds of purchase and conveyance this franchise was transferred to the plaintiffs. By virtue of a consolidation ordinance passed by the city in 1902, the terms and conditions of said franchise became a part of the franchise under which the companies were operating at the time the permits in question were applied for. Can it be said that a court sitting both as a judge and a jury would not be authorized in concluding that the "permits" in question are within the purview of the above fifth condition of the companies' franchise? The only limitation placed upon the city in regulating the "establishment" of the companies' system is that the same shall be reasonable. The reasonableness or unreasonableness of the "permits" in question was a fact for the judge to determine under all the evidence submitted to him. From the

decree it is presumed that he found that the city acted reasonably in fixing the conditions to the " permits " in question. Is there not sufficient evidence to sustain his finding?

The city's sworn answer in the case was a part of the evidence submitted to the presiding judge. In this answer we find the following: " These defendants take issue upon the use of the word ' manhole ' and insist that petitioners desire to construct transformer stations or vaults at the places named." " That such station or vault would practically usurp one side of the street, and either prevent or render doubtful any further use of that side of the street for such municipal purposes as sewers and water-pipes, or from any other proper and public use thereof. " The term ' manhole,' as used in the ordinances, describes an occupation of a portion of a street of sufficient size to permit corners to be turned and the presence of a man in said hole to make necessary adjustments." " The city denies that these ordinances contemplated the erection of vaults of the size now proposed, in which vault large transformers will be installed, and which vaults are of such size as to monopolize the side of the street in which they are constructed." R. C. Turner, city electrician, testified: " That in order to serve the general public with heat, light, and power generated by electrical current, it is not absolutely essential for transformer stations to be located under the surface of the street; but that the same service could be rendered by locating the transformers on private property." In fact the evidence discloses that the companies have transformers located on private property. H. L. Collier, chief of construction of the city, testified: " That underground rooms or vaults of the size of 11 feet 4 inches by 16 feet four inches, and of the other sizes which plaintiffs propose to construct, and for which they have asked for permits, will interfere with the use which the city is required to make of the underground portion of the street, and from time to time extending its sewer pipes and mains and also its water-pipes and mains."

It is quite certain that the city has the inherent and sovereign power, as a municipal corporation, to pass all necessary regulations as will protect its drainage and water systems; and it is equally certain that these powers cannot be surrendered by contract, grants, franchises, or otherwise. In the case of the *City of Augusta* v. *Cleveland,* 148 *Ga.* 734 (98 S. E. 345), this court held that

" The duty of a city to maintain its sewerage-drainage system in a good working and sanitary condition is a governmental function."
" All grants and contracts made by a municipal corporation are made subject to the rule of law that it may not divest itself of the governmental or police power which it holds in trust for the public; and therefore any action taken by the municipality which falls within the proper scope of these powers is valid, regardless of whether or not it contravenes the terms of a prior grant or contract." 12 C. J. 10, 11.

Able and learned counsel for the plaintiffs argue with considerable force, that, while the city has the right, ir the exercise of its police power, to regulate the installations in question, the condition affixed to the permits is not a legitimate exercise of the police power, but is an impairment of the companies' contract rights with the city under their franchises. It is often quite difficult to determine whether a certain municipal act is a lawful one as being within the scope of its police power, or whether it is an unlawful one as impairing contract rights. Oftentimes the line of demarcation is so close, as in the instant case, that the classification of the act in question cannot be made by considering only the nature of the act itself, but all the attending circumstances of its commission must be well considered. When we view this case from this light, we are driven to the conclusion that the city, in affixing the condition to the permits in question, was within the legitimate exercise of its police power, and in so doing no contract right of the companies was impaired thereby. " A municipality, in the public interest, has authority to prescribe the plan and location of the pipes and hydrants of a water company." 40 Cyc. 782. " Corporations which receive franchises take granted privileges subject to the power of the State to require them at all times to do whatever may be necessary for the health, safety, and welfare of the community." 33 R. C. L. § 33. " Although the grant of a utility franchise must, unless otherwise provided, be held to be in perpetuity, yet it is subject to the full exertion of the police power of the State in respect of the mode of conducting the business and the character and quality of the services rendered. For example, the State may at all times regulate the size and location of poles, the height of wires from the surface of the ground, and their location in the street; and when poles and wires become a

serious obstruction and a nuisance in the streets for any cause, it may take such action and make such provision by law as were needful to remove the nuisance and restore the utility of the street for public purposes. Likewise the State may prescribe the location of railroad tracks, the size and character of the rail, the precaution which shall be taken for the protection of the public, and the character and style of highway crossings." 12 R. C. L. § 34.

There can be no question as to the right of the companies to install manholes, conduits, etc., in the streets of the city, by virtue of their franchises, subject to reasonable regulations that may be prescribed by the city authorities. However, this right to install manholes does not mean the right to establish any size the company may deem proper. Therefore, if the city has the authority to regulate the size and prohibit the installation of manholes of an unreasonable size, the fact that it permits the companies to establish manholes of a size it deems unreasonable cannot invalidate a condition attached to such permit to the effect that the companies are to remove these manholes on six months' notice whenever the municipal necessities require it, and such removal to be without compensation. As to the right of the city to affix conditions to franchises, see 19 R. C. L. 1153; 12 R. C. L. 193; 26 C. J. 1031. A reasonable construction of the condition affixed to the permits in question, when viewed in the light of all the evidence submitted, is that the city could not disturb any of the manholes established under the permit, except when governmental or municipal purposes required it. The language of the permit seems to preclude even the right of the city to interfere with such manholes should the city become a competitor of the company and the manholes should prove to be an obstruction to its operation. It seems that the city has been somewhat laborious in its effort to convey the idea that it would not disturb the companies' manholes, etc., established under the permit, except for municipal or governmental purposes. The use of the words, " and not for the purpose of accommodating private individuals or private purposes," when taken in connection with the preceding words, " public or municipal purposes," in the permits in question, evidently means that the city could not " rescind and repeal the grants," unless it became necessary for governmental or municipal purposes. This meaning is reinforced by the city's attorney's admission in judicio,

that the word " public " in the permits was synonymous with the word " municipal," and this admission became a part of the decree rendered.

Counsel for the companies in their briefs cite authority to the effect that " municipal purposes " may be private purposes as distinguished from governmental or police power and regulations. That is true; and it will be observed that the words " private purposes " are used in the permit for the sole purpose of distinguishing such purposes from " municipal purposes." " Municipal purposes are public or governmental purposes as distinguished from private purposes." 5 Words & Phrases, 4629.

After giving the entire voluminous record in the instant case mature consideration, and keeping in view the principle of strict construction of grants and franchises in favor of the public, yet giving them a fair and reasonable construction, the conclusion is reached that the city had the right to affix the condition to the permits in question, and that by doing so no right of the companies has been violated, either under their franchises or under the laws of the State or of the United States.

BECK, P. J. I am of the opinion that the judgment of the court below should be affirmed on the grounds stated by Judge Hodges in construing the judgment and decree of the court below. And giving to that decree the construction thus placed upon it, an order for the removal of the structure in question, which the plaintiff in error proposes to place in the street under the surface, would amount to nothing more than an exercise of the police power.

TARVER, Judge. I cannot agree that the effect of the language in the reservation attached by the city to the permit was merely an exercise of its police power, and that in the exercise of the rights thus reserved hereafter it will be limited to purposes of a governmental nature, as distinguished from those in which a municipality is not acting for the preservation of the public morality, peace, safety, and health. The operation of a system of waterworks, for example, is not the exercise by a city of a purely governmental function. *Huey* v. *Atlanta*, 8 *Ga. App.* 597 (70 S. E. 71). The reasoning of Judge Hodges leads also to the conclusion, and logically so if police power regulation alone is contemplated by the language of the permit, that the permit " seems to preclude even the right of the city to interfere with such manholes, should the

city become a competitor of the company and the manholes should prove to be an obstruction to its operation." As ably argued by counsel for plaintiffs, if the condition attacked be relied on as a police regulation, it is utterly unnecessary, since, irrespective of such a condition, the city not only had the power, at any time when it became necessary for the public safety or convenience, to require any necessary change in the installation of the alleged " manhole," even removal, but was unable as a matter of law to divest itself of that power. As to the intent with which the condition was affixed to the grant, the statement of the defendant itself, as shown by its sworn answer herein considered, together with the language of the reservation, shows that the city is denying, and intended by the action of its mayor and council in affixing the condition to deny, that the plaintiffs possessed any right, by virtue of the contracts existing between themselves and the city (the various franchise ordinances quoted), to install under its streets vaults of the kind with regard to which this issue has arisen; and insists that it has the right therefore to require such an agreement with reference to removal after notice as it may deem proper. The city contends that in making the reservation it was acting, not in the reasonable regulation of rights conveyed under the company's franchises, but as to a subject-matter not covered by those franchises. Looking further into the record on this point, a quotation from the veto message of the mayor, with reference to the permit first granted without condition, and whose veto resulted in the affixing of the condition complained of in this case, which message is incorporated in the record, may throw light upon the intent of the city authorities in imposing the restriction complained of. " The city has no right to make such grant. The location of these transformer stations is one merely of convenience to the company. It is merely a matter of saving a few dollars and cents to them. The company could, by the outlay of a small amount of money, acquire the right on private property to place these transformer stations, and they have a right to secure, by condemnation, if necessary, these rights; and to permit them simply to save expense to themselves to usurp the streets, to the exclusion of the city itself, is something that I cannot and will not agree to." The proviso in the permit that the city agreed not to rescind or repeal permits except to accommodate public or municipal purposes, " and

not for the purpose of accommodating private individuals or private purposes," does not indicate to my mind that the city only intended to reserve the right to direct removal in the exercise of its police power. The maintenance of waterworks, gas-pipe lines, or competing electric light and power lines would not be the exercise by the city of purely governmental power; yet surely such enterprises maintained by the municipality would not come within the scope of the term, "accommodating private individuals or private purposes," but would come within "municipal purposes," and with reference to these and other similar purposes, construing the action of the mayor and council in affixing the condition to the permits in the light of the facts disclosed in the record, that the restriction in the permit was intended to reserve to the city the absolute power of directing removal of the vault structures after six months notice, without compensation to the plaintiffs.

Having this view of the meaning of the permit with the condition attached, the question remains, in so far as my conclusion is concerned, whether or not such a reservation is an impairment of the contract rights of the plaintiffs, evidenced by the various franchises granted them by the city, and is an attempt on the part of the city to deprive the company of property without due process of law. If the franchises granted to the plaintiffs, under which they are operating, convey the right to erect a structure such as the one concerning which this issue exists, subject only to reasonable police regulations intended to protect the safety and convenience of the public in the use of its streets, then it seems to me that the condition attacked is invalid, and the judgment of the court below upholding it should be reversed; for the city, by this condition, manifestly undertakes to reserve to itself a much greater power than that which it is privileged to exercise in its governmental capacity, as a creature of the State, in the matter of preserving public health, morals, safety, convenience, etc., which are properly the subjects of police power. It is, of course, well settled that when a municipal corporation, by virtue of authority expressly or impliedly delegated to it, lawfully grants permission to a public-service corporation to lay its rails, pipes, wires, or other structures in a public highway, and does not expressly reserve any power of rescinding its grant, the permission so granted is a property right protected by the constitution from arbitrary revocation, impair-

ment, or destruction by the municipal authorities. 19 R. C. L. 1154, and cases cited. " A perfected utility franchise, constituted either by direct legislative grant, or by consent of local authorities in pursuance of the constitution and general laws, especially when followed by actual construction and operation, is a property right that cannot be afterwards taken away, impaired, or diminished, either by subsequent constitutional amendment, or by legislative or municipal action, except in the exercise of the police power, or the right of eminent domain." 12 R. C. L. 207 et seq., and cases cited. If the city grants the permits applied for by the plaintiffs under the terms of their franchise, it cannot legally reserve any rights relative to removal, without compensation, other than those which it possessed without reservation as a matter of law in the reasonable exercise of police power. If, however, the right to build such structures in the streets of Atlanta had not been granted by previous action of the mayor and council under proper legislative authority, and the application of the plaintiffs to exercise it came before the governing body of the city, raising a question not already settled by contract, it seems that the matter of attaching conditions such as the one under discussion would come within the discretion of the municipal authorities, with the right on the part of the plaintiffs to accept or decline the privilege granted with the condition attached, as they might deem proper.

" On granting the privilege to use a street, the municipality ordinarily has the power, in its legislative discretion, to impose conditions." 28 Cyc. 876, and cases cited. In addition to the citations given upon the same subject in the opinion of Judge Hodges, see 12 R. C. L. 179. The question, therefore, for determination here seems to be, whether the franchises granted by the city to the plaintiffs conveyed the right to erect these transformer vault structures in its streets. If they did, then removal after consideration could only be accomplished in the reasonable exercise of the police power, and the city had no right to attempt to reserve a greater right, thereby impairing the contract rights of the plaintiffs, or attempting to do so; if they did not, then the plaintiffs could not force the granting of such a permit, which would be a matter of grace on the part of the city, which could attach such conditions as its governing body might think reasonable. In addition to the authorities cited by Judge Hodges, relative to the

48

construction of franchise rights, I desire to quote from 12 R. C. L. 194: "According to a frequently repeated statement of the rule by Mr. Justice Clifford, 'Whenever privileges are granted to a corporation, and the grant comes under revision in the courts, such privileges are to be strictly construed against the corporation and in favor of the public, and . . nothing passes but what is granted in clear and explicit terms. Whatever is not unequivocally granted in such acts is taken to have been withheld.' This principle, it has been said, is a wise one, as it serves to defeat any purpose concealed by the skillful use of terms to accomplish something not apparent on the face of the act. . . . It is a matter of common knowledge that grants of this character are usually prepared by those interested in them, and submitted to the legislature with a view to obtaining from such bodies the most liberal grant of privileges which they are willing to give."

The grant of the franchise by the municipality and its acceptance by the plaintiffs constituting a contract, it seems also very appropriate, if there be doubt as to its meaning, to take into consideration the circumstances and conditions under which the parties contracted, and to be aided in that way to arrive at their true intent. It is undisputed in the record that constructions of the character involved here are a matter of very recent development, having been used by the plaintiffs for not longer than three years; whereas the last franchise granted by the city was granted in 1912. It cannot be said, of course, that in contracting with reference to the maintenance of a public-service corporation such as the plaintiffs, the parties intended that it should be limited to the use of such construction and equipment as were in vogue at the time. This is a progressive age; and in agreeing that the power company might install in the streets of Atlanta "all necessary tubes, conduits, . . manholes, and appliances and connections for the business and purpose of conveying, using, conducting, supplying, and distributing electricity," etc., the city necessarily agreed to the use of such appliances and construction *of the character stated* as might at any time in the future be most reasonably suited to the conduct of the business of the plaintiffs.

That a room eleven feet four inches by sixteen feet four inches, eight feet deep, containing four transformers, cannot properly be denominated a "manhole" is at least a contention amply sustained

both by common sense and the evidence for the city in this case; that the installation of such an apartment in the streets of Atlanta is not reasonably necessary to the proper conduct of the business of the plaintiffs might easily have been found to be true by the trial judge; especially in view of the testimony that "manholes" 5 or 6 feet by 8 feet in dimensions, and as they were known at the time of the passage of the franchise ordinance of 1912, are used for similar purposes, and that other transformer stations are located on private property. In view of the wide variance between the vault in question and the manhole, as shown by the evidence, and as they existed at the time of the franchise grant, and the conflicting evidence with reference to the necessity for locating such structures in the streets in the maintenance of the business of plaintiffs as the ones for which they sought permits in this case, the court below, in my judgment, would have been authorized to conclude that the mayor and council of Atlanta, by their ordinance in 1912 and prior thereto, by the language used therein, conveyed no such right as that which is insisted upon by the power company here; that the matter of extending the privilege of building these vaults underneath the city streets to the company now rests in the sound discretion of the mayor and council of the city; and that, in extending it, a condition such as is attacked in this case may be attached, enforceable not only in the exercise of the police power but for any muncipal purpose. It may be a harsh condition. If it is not a right, however, that the power company already had, the company is relegated to obtaining it, if it desires to do so, upon the best terms it may from those to whom, as the representatives of the sovereign power of the State over her highways, it belongs.

JONES, Judge. On application by the power company the city first granted the permit, as requested. This resolution was vetoed by the mayor, and a new resolution was passed granting the permit with the condition or reservation attached, of which complaint is here made, to wit: "The city reserves the right at any time, after six months notice to said applicant company, to rescind and repeal the grants herein made, and without liability to the city on account thereof; provided that the city agrees not to rescind or repeal permits except to accommodate public or municipal purposes, and not for the purpose of accommodating private individ-

uals or private purposes." The controlling question in the main bill of exceptions is, the right of the City of Atlanta to attach the quoted reservation to the grant of the permit. The plaintiffs contend that the city authorities had no power to limit their right, both by grant and contract, to build necessary manholes under the streets within the fire limits of the city; that by an acceptance of the permit with the condition attached it would have surrendered its franchise rights without compensation. The city contends that the condition complained of does not limit the rights of the plaintiffs, but is simply a reservation of the right of the city in the premises; that is, to compel a change or removal for "municipal purposes" only, should it ever become necessary. There is also complaint by the city of the size of the manholes undertaken; characterizing them as vaults. Assuming that the plaintiffs were proceeding under legal grants, they had the right to use the streets to build and maintain an electrical system. The language employed in the various franchises plainly and specifically gave them the right to build and equip the necessary manholes for transformers and electrical equipment. Of course a grant to the use of a street is always taken subject to the power in the municipality to make and enforce, by proper ordinances, all needed police regulations. The power of a municipal corporation to make police regulations includes authority to make reasonable provision for the health, safety, and convenience of its inhabitants. The city could pass any reasonable police regulation as to how the work should be done, and enforce it. Or, if it became necessary in a legitimate exercise of the police power, the city could compel the changing or removal of anything placed in or under the streets of the city by the plaintiffs. This can be done without any reservation or condition in a permit, because the city cannot divest itself of its police power. It is undisputed that the demand for light and power service in the City of Atlanta has grown to such an extent that it has become necessary for the Georgia Railway & Power Company, as a public-service corporation, to enlarge and extend its equipment; and to do that it was necessary to use transformers, which necessitated making necessary manholes under the streets. The City of Atlanta does not controvert this condition, but takes the position that the plaintiffs must arrange to build these receptacles on private property. The City of Atlanta requires all

electrical equipment used in conveying and distributing power and heat within certain designated fire limits to be placed under ground. The plaintiffs, for some years prior to the application for the permit in question, had been granted franchises to build and equip their lines, and had complied with the requirement of the city as to placing that part of the lines under ground that were within the fire limits. The time may come when there will not be space enough under the surface of the streets in the congested parts of the city to accommodate the municipality in performing its necessary police requirements, and a public service company in furnishing the population with gas, electric lights, and power; now considered necessities. When that time arrives, the public-service company must surrender the use of the streets; the rights of a municipality to the use of its streets in the exercise of its police power are paramount to granted rights. The *undisputed* evidence is to the effect that the manholes in question are as small as can be used for the present needs in distributing electricity at the places named, and that they will in no way interfere with the use of the surface of the streets at any time, and that the space to be used under the streets is not now in use by the city for any purpose. The city says that the space to be used as a manhole may be needed by it in the future; and when so needed, the plaintiffs must remove all equipment placed there by it. The city would clearly be within its rights if this space should be needed by it for such uses as legitimately come within its police powers. While much is said respecting the size of the manholes the plaintiffs were endeavoring to construct, yet the city had no rules or regulations on the subject, or questioned the absolute necessity for manholes as large as contemplated. The plaintiffs, at great expense, complied with the requirements of the city in placing its lighting system under ground; transformers are absolutely essential; the transformer must be in a receptacle known as a manhole, so as to be reached from the surface of the street for regulation or repair. Through its proper officials, on the application of the plaintiffs, the City of Atlanta granted permits to build the manholes complained about; it is to be presumed that the officials duly investigated the matter; it is in the record that the application went fully into details as to the size and construction of each manhole. These permits were granted without any reservation or condition

respecting size or construction. The plaintiffs undoubtedly had a right, both by franchise and by contract with the city, to build some kind of a place under the street called a manhole; the city by its permit approved the one now complained about. While this was done the city attached a condition requiring its removal under certain circumstances; and this condition is the storm center of this case. These manholes and equipment are to be removed on six months notice, if it should become necessary to " accommodate public or municipal purposes; " the entire condition being given in the first part of this opinion. Reading the entire condition, and especially the words quoted, it will readily be seen that to build and equip the manholes under these conditions might mean the surrendering of vested and contract rights. It is argued by learned counsel for the city that this condition is but a reservation of the police powers of the city. If that is all the city meant, then no reservation in writing was necessary; for no grant, however solemn, could take away or dispose of the city's police powers. Does not this reservation mean that these things are to be removed whenever this space should be needed for anything engaged in by the municipality? It might easily be understood to include any one or more of the various activities sometimes engaged in by modern municipalities. If this condition is construed as simply a reservation of a police power, it is wholly unnecessary; and if for any other activity that the city might engage in, it would be invalid as against the franchise and contract rights of the plaintiffs. Again, if the permit granted by the city is in excess of the charter rights of the power company and carried privileges outside of and beyond the corporate charter, it would be of no binding force against the State; and it is doubtful, at least, if it would possess any validity whatever. On the controlling issue compare Los Angeles *v.* Los Angeles Gas & Elec. Corp., 251 U. S. 32 (40 Sup. Ct. 76, 64 L. ed. 121).

I am authorized to say that Mr. Justice Gilbert concurs in the views and the conclusion herein expressed.

HAMMOND, Judge. In opposition to the opinion written by Judge Hodges, in earnest support of the opinion written by Judge Jones, and in the light of all therein said, this word, touching only the high points in the case, is added. The judgment of the lower court should have been reversed on the main bill of exceptions, and affirmed on the cross-bill.

What are the rights of the companies? They are public-utility corporations, chartered by the State. These charters give them the right to occupy the streets of the city. Their business is a public business, and the use of the streets is needed for the accommodation of the public. These rights emanate from the highest source, and stand independent of any secondary grant by the city; but as a matter of fact the city has made such grants. These grants are unequivocal, comprehensive. They mean nothing more, nothing less, than the right of the companies to occupy the streets with all appliances and means necessary for the distribution of commercial electricity. These grants — these contracts, for such they are, have stood between the city and the companies for twenty years. The city, on its part, has gone forward during this period, exercising over the company police power, and collecting annually its franchise tax; the company has gone forward developing its vast electrical system. Though denied by the city, the lower court wisely held these contracts to be now existing and binding upon the parties. This court, in the judgment rendered, sustains the lower court in upholding the validity of these contracts. In such a discussion need we dwell on the sanctity of contracts before the law, or the duty of courts to sustain them unimpaired? In the face of these contracts, these grants from State and city, declared binding upon the city and companies by this court, what has happened? The companies, in regular course of daily work, apply for a mere formal permit to install electrical appliances under a street. No more can be made of it, for it is understood that this application for a permit was nothing more than a notice by the company to the city that work had to be done, and would, of course, be done under police regulation. Let us dismiss once for all from this discussion the hint that the proposed installation was in any respect unnecessary, out of place, or faulty. The record makes no such issue. On the contrary the admissions in the pleadings and the undisputed proofs are, that the installation was timely, proper, and called for by the development of the company's business, in the discharge of the company's business, in the discharge of its duty to the public. The application for permits to make electrical extensions on and under the city's streets was a matter of everyday occurrence between the city and the companies. But what strange and startling things transpired on this particular occasion?

The chief of construction refused the permit, and, without precedent, or any provision in existing ordinances, referred the matter to the city council; council then passed a resolution granting the permit as asked for by the companies, but this the mayor vetoed. Council finally passed a resolution granting the permit, but with this unwarranted and vicious condition attached: " The city reserves the right at any time, after six months notice to said applicant company [said applicant company being the applicant above named], to rescind and repeal the grants herein made, and without liability to the city on account thereof; provided that the city agrees not to rescind or repeal permits except to accommodate public or municipal purposes, and not for the purpose of accommodating private individuals or private purposes."

The court below seemed to treat casually, to minimize this anomalous resolution. Two of my associates here find it possible to explain away any legal wrong it does the companies. They discover in it explanatory clauses about "municipal and private purposes" that render it toothless. Their reasoning is that it amounts only to a declaration of the city's right to exercise police regulation over the companies. If it is only that, it is an idle declaration. We all bow to police regulation. What a striking example of its exercise we find in this very record: Several years ago the city said to these companies, in effect, " Get off the earth." They got off. They got under the earth. It cost them one and a half million dollars to dig in, but they dug in. Where is the question of police power pertinent in this discussion? This regulation is nothing more than what in properly administered law should be a vain attempt to superimpose upon these long-standing grants brand-new conditions. One of the contrary opinions goes the full length in declaring that the city, upon the acquiesence in the resolution by the companies, would have the right for any reason to exact the removal of these costly appliances. Certainly it is fraught with mischief for the companies, and they do well to beware. Under guise of a permit to do a simple street job, the city, in this resolution, is sapping the life-blood of the companies and tearing to shreds its own grant. Was there anything in the situation presented that suggested police regulation? No. Did the city council make any such claim? No. Do the terms of the resolution imply it? No. Note the word " grant " in the resolu-

tion. The companies were asking for no grants. Grants had been made to them twenty years ago — before they started business — by city and State. Will courts of law require a grantee to accept new vital conditions and limitations upon an unrestricted grant imposed at the mere whim of the grantor? There is no need to develop here all the direful consequences to the companies, when this court allows to be written into their ancient grants from State and city the shocking provisions of this resolution. Should it be finally upheld with its provisions to "rescind" and "repeal," to require removal and destruction of property without compensation, the companies' work would be hopelessly hampered, its credit shattered, its charter obligations to furnish heat, light, and power to a people unfulfilled.